[Cite as *In re Adoption of B.L.*, 2021-Ohio-1221.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re Adoption of B.L.

Court of Appeals No. H-20-016

Trial Court No. AD 2019 00011

**DECISION AND JUDGMENT**

Decided: April 9, 2021

* * * * *

Paul D. Dolce, for appellant.

Heather Niedermeier Heyman, for appellee.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal from the July 31, 2020 judgment of the Huron County Court of Common Pleas, Probate Division, by appellant, V.D.U., the mother of B.L. ("mother"). For the reasons that follow, we affirm.

{¶ 2} Mother sets forth one assignment of error:

The trial court erred when it determined mother's consent to not be

necessary for the proposed adoption pursuant to ORC 3107.07(A)[.]

## Background

{¶ 3} In January 2011, B.L. was born to mother and father, who were not married. In 2013, father married appellee, Br.L. ("step-mother"). At some point, mother and father had a shared parenting plan for B.L.

{¶ 4} On September 3, 2015, a hearing was held before a magistrate in the Huron County Common Pleas Court, Juvenile Division ("2015 hearing"), and on September 10, 2015, the magistrate's decision was filed.

{¶ 5} Also on September 10, 2015, the juvenile court issued a judgment, adopting the magistrate's decision ("juvenile judgment"). The juvenile court terminated the shared parenting plan, and named father the residential parent and legal custodian of B.L. Mother was "not afforded parenting time with the minor child until she separately petitions the Court for parenting time, appears before the Court and submits to a hair-follicle drug screen that tests negative for all illegal substances and until further order of the Court." Mother was also ordered to pay child support for B.L.

{¶ 6} On October 4, 2019, step-mother filed a petition to adopt B.L. with the Huron County Court of Common Pleas, Probate Division, in which she alleged father's consent to the adoption was required but mother's consent was not required because mother failed without justifiable cause to provide more than de minimis contact with the child and failed without justifiable cause to provide for the maintenance and support of the child for at least a year before the adoption petition was filed. Father consented to the adoption; mother filed an objection. The probate court bifurcated the issues of mother's

2.

consent to the adoption and B.L.'s best interest, and on July 20, 2020, a hearing was held on whether mother's consent to the adoption of B.L. was necessary.

{¶ 7} On July 31, 2020, the probate court issued its judgment entry finding mother failed to provide more than de minimus contact with B.L. for at least one year before the adoption petition was filed and mother failed to provide for the support and maintenance of B.L. as required by law or judicial decree for at least one year before the adoption petition was filed. The court further found mother's consent to the proposed adoption of B.L. was not required. Mother timely appealed.

**Hearing**

**Mother**

{¶ 8} Mother was called as the first witness by step-mother's attorney, and mother was cross-examined by step-mother's attorney. Mother testified she lives in Pennsylvania, and has resided at her current address for two years. Before that, she lived down the road for six months, prior to that she lived at a residence for two years, and before that she was living at an address for three years. Mother believed she provided all of these addresses to the court, but not to father.

{¶ 9} Mother last saw B.L. four years ago, right before the 2015 hearing, and she last spoke with B.L. "probably about 2016 or 2017. [Father's mother] would let me call B.L." The last thing mother mailed to B.L. was "for Easter or Christmas, one of the two. I would say probably about two years ago." Mother used to send Christmas or birthday gifts for B.L. to father's mother, but recently stopped sending gifts as "the past year,

3.

[father's mother] would not [take the gifts] because [father] would not have contact with [his mother]."

{¶ 10} Mother has had her current phone number for a couple of months, and before that, she had her phone number for years. Mother had quite a few phone numbers when she was living in Ohio, and she had a couple when she first moved to Pennsylvania. She has not always provided father and step-mother with those phone numbers.

{¶ 11} Mother had father's phone number in the past, but when she changed phone carriers, she lost all of her contacts. When she had father's number, she tried to call and talk to B.L., but father ignored her. Mother said about a year ago, she "tried to call [father] from a number that my mom had; and he called me back and said it was the wrong number * * * and then hung up." She did not think she ever had step-mother's phone number, or "[m]aybe a really long time ago." If mother tried to contact step-mother, it would be on Facebook Messenger, but step-mother blocked her on Facebook.

{¶ 12} The last address that mother had for father was when he was living with his mother, before the 2015 hearing. Mother was told father moved shortly thereafter, and father's mother "refused to give me [mother] an address, because she didn't want to upset [father]." Mother asked father's mother multiple times for father's address and the school B.L. attended, but father's mother refused to tell mother.

{¶ 13} Mother said she tried to refile the juvenile case a year to a year and one-half after the 2015 hearing using father's mother's address because father's address was confidential, but "[t]hey would not file it for me." Mother stated "I have been unable to

4.

open a case because I don't have an exact address for him specifically." She offered to send the filing to father's job but "they wanted the correct address for him."

{¶ 14} Mother was shown a motion she filed in the probate court, which motion stated, inter alia that "there is an open case for visitation of [B.L.] I filed before receiving adoption and rejecting adoption." Mother admitted this was a lie. Mother explained "I never did any of this paperwork. My mom did it all, so. * * * My mom fills it out for me and I just sign it. * * * I don't know how to fill out this paperwork." Mother assumed she read the paperwork before she signed it. Mother then invoked her right against self-incrimination and refused to answer any more questions with respect to the motion.

{¶ 15} Mother was presented with a letter which she submitted to the juvenile court in 2015, which purports to be from a "CYS Case Worker." Mother again invoked her right against self-incrimination and refused to answer any more questions with respect to the letter. Mother was then shown a paragraph from a magistrate's order which set forth "the Director of Butler County Children Resources has submitted a letter to Attorney [for father] stating that the letter [mother] submitted to the Court was a fake and not signed by any staff member of their agency."

{¶ 16} Mother testified she made another attempt to refile "probably about, I know I tried right before they filed, like four months before they filed. I called up here again and wanted to know if there was any new record of his address out here so that I could file again. And I filed, me and my grandmother tried to file before she passed away; that would have been three years ago." Mother said her "grandma actually got a lawyer to try

5.

and find his address. * * * I know it was unsuccessful. We, she even tried, I guess the lawyer tried finding if he was in Norwalk Schools, because that's where I assumed they had lived at."

{¶ 17} Mother stated she did "[s]earches online for [B.L.], [to] see if he was enrolled in Norwalk Schools or surrounding schools. I've looked at [step-mother's] documents online trying to find her address, see if they bought a house; same with [father]. I've done multiple things." She said the last time she looked to see if father and step-mother bought a house was in June 2019, and she was unable to find anything. Mother did not think she searched voting records. Mother Googled step-mother's name and "came up with a bunch of different thing that you could pay and do or, you know, background checks, stuff like that." Mother "paid for a couple of them, and it was a dead end all the time." Mother found an address "from like 2014, something like that, that we had found. I was like, well I'm sure she don't live there, so." Mother did not try the address.

{¶ 18} Mother was shown exhibits dated "September 29th, 2018, May 18th, 2019 [and] * * * December 7th" which were: a message from mother to her mother, where they were trying to look up father; and messages from mother's mother, on her Facebook account, "which was actually me, to [father], where I tried to get in contact with [father] and got no reply." Mother was seeking pictures of B.L. Mother was asked about a White Pages search from August 8, 2019, where her mother searched for step-mother, then father.

6.

{¶ 19} Mother testified she did not have contact information for any other family members. When she lived in Ohio, she probably had contact information for Sherry Tallman, but mother said she did not have any current contact information.

{¶ 20} Mother worked at Chili's restaurant for over two years before she was laid off due to Coronavirus. She believed her court-ordered support for B.L. was $80 a month. Her income for 2019 was "20 some thousand." Mother worked continuously at Chili's from October 4, 2018 to October 4, 2019, and she thought she was paying child support regularly during that time. She was unaware if the full amount of child support was taken out of her paycheck, because "I never, like I don't ever look at my pay stubs, so I don't know how much is actually being taken out." Mother never sent any additional money to father for child support, nor did she send anything else to B.L., like clothes or supplies.

{¶ 21} On direct examination by her attorney, mother testified she believed there were other amounts deducted for child support from her paycheck but she was "unsure of what they are because I don't get like a paper pay stub."

{¶ 22} Mother testified the last time she tried to file proceedings in juvenile court was March or April of 2019, but she "was unable to because the address for him was confidential and there was no recent address through child support." After she received the adoption petition, mother said "[t]hat was the first time I've had an address [for father] in four, five years." Then, mother initiated proceedings in juvenile court, which were stayed pending the outcome of the adoption.

7.

{¶ 23} Mother was shown an exhibit dated March 11, 2019, which was an email from mother to her mother "about us looking for [step-mother] like addresses report. * * * [W]e paid for this service * * * May 29th, 2019." Mother did not get a current address for step-mother; rather she received relative addresses and an address for step-mother "from like four or five years prior."

{¶ 24} Mother was also shown an exhibit from May or June 2019, which was a search history of school records looking for B.L.'s school. She assumed B.L. went to Norwalk schools. Mother learned about B.L.'s school district after the adoption petition was filed, when father's mother told her.

{¶ 25} Regarding Sherry Tallman, mother said they did not have a relationship, and in "2014, 2015," mother's relationship with Tallman was "[n]ot very well," because Tallman "started some stuff when [Tallman's daughter] was babysitting B.L." Mother said Tallman's daughter babysat B.L. once or twice a week when father's mother was unable to babysit. Mother did not recall ever having Tallman's phone number.

{¶ 26} Mother lost her phone after the 2015 hearing and was never able to get father's phone number back, but her mother had a number for him, so mother tried that number. "[Father] answered and said -- I believe he hung up and then texted me, which I believe I also sent you that text message, that stated, 'Sorry, wrong number.'"

{¶ 27} Mother would have her mother contact father's mother every couple of months "to try to get her [father's mother] to give up an address."

8.

{¶ 28} On re-cross examination, mother said she did not go to the 2015 hearing because "I was currently having a child." Mother was asked if the searches conducted in 2019, regarding step-mother owning a home in her name, turned up nothing. Mother replied, "I believe so." Mother did not have the records with her from the result of a search where 11 personal records found for step-mother. Mother was asked "[s]o we don't know what they say * * * [and] [w]e don't know if [step-mother's current address] was on those?" Mother responded "[c]orrect" to both questions.

{¶ 29} On re-direct examination, mother was asked if any of her searches yielded a current address for step-mother, and she said "I don't believe so, no."

**Sherry Tallman**

{¶ 30} Tallman testified father is her step-nephew, as Tallman's brother is married to father's mother. Tallman has known father since 2005, and she has known mother since late 2010. Tallman was at the hospital when B.L. was born, and she used to spend a lot of time with B.L. when he was little. Tallman's daughter was good friends with mother and they lived together. Tallman and her daughter babysat B.L. when he was two to three months old until he was six to eight months old while mother worked third shift. Tallman said "a lot of times I would just have him there for * * * two to three days, and not hear from her [mother]."

{¶ 31} Tallman's phone number has changed, but her Facebook profile, which is public, has never changed. Tallman has continuously had Messenger and she has not blocked mother on Facebook. Tallman has always known where father and step-mother

9.

were living, and has had their phone numbers. Tallman has not heard from mother in the last few years, and mother has not attempted to find out father and step-mother's address or phone numbers from Tallman in the last couple of years. Tallman said mother would have been able to get in contact with her, and if mother would have contacted her, Tallman would have put mother in contact with father.

{¶ 32} Tallman knew father's current relationship with his mother was not good, but father has "never withheld [B.L.] from anyone." Tallman discussed the adoption with father as well as mother's contact with B.L. Tallman stated mother "has not tried to contact him through any means that I know of. * * * [Mother] hasn't been in the picture. * * * [B.L.] does not know [mother]." Based on the amount of mother's parenting time with B.L., Tallman did not think father wanted contact between B.L. and mother.

**Father**

{¶ 33} Father testified he has been married to step-mother for seven years, they have owned their home for two years and lived in the home with B.L. for a year. The deed to the home is in father and step-mother's names. Before living in their home, the couple and B.L. lived with step-mother's grandfather in Norwalk, Ohio, for about two years. Prior to that, father and B.L. lived with father's mother in Monroeville, Ohio, for roughly one year, until July 2016. Previous to that, father lived in Bellevue Ohio.

{¶ 34} Regarding the juvenile judgment, under the proof of service section, it does not list an address for father, it says address is confidential. Father had no idea why that

10.

is because he did not ask the court to keep his address confidential.  Father acknowledged he had a duty to provide the court with his current address, but did not do that.

{¶ 35} Father said mother knew where he was living when he lived with his mother, and he communicated with mother off and on.  During that time, mother did not see B.L but she spoke with him on the phone.  Father was not aware of mother filing a case in juvenile court for visitation while father lived with his mother.  After father left his mother's house, his contact with mother was very few and far between.  Since 2015, he has received no mailings from mother, and to his knowledge mother has not sent anything to B.L.  The last time father heard from mother was on B.L.'s birthday in 2016.

{¶ 36} There was also a court order for mother to pay child support, but father did not receive consistent support payments from her.  Mother never sent other money, gift cards, food or clothes for B.L.'s support.

{¶ 37} Father has had two phone numbers, and he has had his current number since 2015, and when he got his new number, he sent that number to every number he had for mother and mother's mother.  Father said mother changed her phone number often.  In 2019, Father did not have a missed call, nor did he return a call and realize it was mother, and hang up.

{¶ 38} Father has never instructed anyone not to tell mother where he lived, and in the last few years, mother did not ask father where he lived.  Father has never hidden his address from mother.  Father was not aware of any type of protection order or court order

preventing mother from having contact with B.L. Father never told mother she could not call him or talk to B.L.

{¶ 39} Father has not had any messages or communication from mother on Facebook. He has had mother blocked on Facebook because "I put personal stuff on there and I don't think she needs to see it." Father does not put B.L. on Facebook as he "keep[s] [B.L.] off the line." Step-mother does put posts about B.L. on Facebook.

{¶ 40} Father did not know what the stipulations were or what he had to do for step-mother to adopt B.L. Father was not aware that if mother had contact with B.L. or paid child support it would be problematic to step-mother adopting B.L. Father has not always known mother's address, including in October 2019, when the adoption petition was filed. To locate mother, father said "[w]e ended up just doing a search of her; and any known location, we sent mail to."

{¶ 41} Father is not on good terms with his mother, which has nothing to do with mother, and his mother has not seen B.L. since Christmas 2017. Father said his mother had contacted him about mother's mother trying to see B.L. Father did not understand why mother and her mother did not contact him, because his phone number had not changed. Father did not tell his mother to give mother or her mother his phone number or address.

{¶ 42} Father never gave his mother pictures of B.L. to give to mother because "I didn't think that was my job." Father wanted B.L. to have a relationship with mother

12.

"[i]f she chose to. * * * If [mother] wanted the relationship with [B.L.], then I was fine with it."

{¶ 43} Regarding school, in September 2015, B.L. was registered for school in Monroeville. For the 2016-2017 school year and thereafter, B.L. has attended school in Edison School District.

{¶ 44} Since father received full custody of B.L., father's motivation was to take care of B.L., not to keep B.L. from mother. Father thought it was in B.L.'s best interest to have a relationship with mother.

### Step-Mother

{¶ 45} Step-mother testified she lived with her grandfather from July 2015 until May 2018. In July 2016, father and B.L. moved into her grandfather's house. In July 2018, she and father bought their home, and both of their names are listed on the deed.

{¶ 46} Step-mother has been a registered voter since she was 18 years old, and she keeps her voting record up-to-date with her address. She has had the same phone number since she was 13 years old, mother had the number and step-mother never blocked mother. Since 2015, step-mother has not received mother's new phone number or address.

{¶ 47} Step-mother has had no contact with mother since July 2016. Step-mother blocked mother on Facebook after mother deleted step-mother as a friend, long ago. In September 2016, step-mother received a Facebook message from mother's mother saying she was trying to get a hold of B.L., she did not know step-mother's number and father

13.

does not answer. Step-mother did not respond. Step-mother has not blocked mother's mother on Facebook.

{¶ 48} Step-mother never instructed anyone not to tell mother where she lived, nor did father. Step-mother was unaware of father refusing to allow mother to speak with B.L.

{¶ 49} Step-mother acknowledged that B.L. calls her mom, even though the court order says father shall ensure that the child does not call another person mom.

{¶ 50} Step-mother recently became aware that mother tried to contact B.L. through father's mother. Step-mother also recently learned father did not keep the court updated with his current address.

{¶ 51} Regarding B.L.'s school, step-mother agreed mother would probably have no knowledge that B.L. was enrolled in Edison School District.

{¶ 52} In the year before she filed the petition for adoption, step-mother was not aware of mother having any communication with B.L. or mailing anything to B.L.

{¶ 53} When she filed the adoption petition, she did not have an address for mother or have any idea where mother was living. She said "[w]e did some searches. We found multiple addresses. * * * And then we just sent certified mail to every address we could."

**Probate Court's Judgment Entry**

{¶ 54} The probate court observed, inter alia, that after the juvenile judgment was issued, mother "never petitioned the juvenile court for parenting time until 10 days *after*

14.

being served with [step-mother's] adoption petition. No evidence exists that she appeared before the juvenile court to submit to a hair-follicle drug screen and no other order was issued by the juvenile court regarding her parenting time." Further, "[n]othing in [the juvenile judgment] prevents [mother] from having written, telephonic or video contact with her now 9-year old son."

{¶ 55} The probate court noted "mother also alleged that [father and step-mother] interfered with her efforts to see her son by blocking her on social media sites and hiding contact information from her." Yet, "[s]he admits to never checking voting records or property ownership records both of which would have led her to [B.L.] and his father. She also never attempted to serve [father] with a parenting time motion in juvenile court through alternate means of service, such as service by publication." In addition, father "testified credibly that he never prevented [mother] from speaking to [B.L.] on the phone and she always had his phone number. Unfortunately, [mother] testified she lost the number when she changed phone service." The probate court found clearly and convincingly that mother failed without justifiable cause to have contact with B.L. for more than one year before the adoption petition was filed.

{¶ 56} Regarding child support, the probate court observed mother was required "to pay $67.43 per month in support * * * and an additional $13.49 per month towards an arrearage on her obligation for [B.L.]." In the year before the adoption petition was filed, mother's "total current support obligation was $809.16, of which she paid $252.57 (31%), and the required payments on her arrearage were $161.88, of which she paid

15.

$81.13 (50%)." The probate court noted mother had steady employment for the relevant one-year period, but she did not monitor the amounts withheld from her paycheck. The probate court found mother "had an ability to pay 100% of her support obligation from the one-year period, but did not." Thus, the probate court found clearly and convincingly that mother failed without justifiable cause to provide for the support and maintenance of B.L., as required by law or judicial decree, for at least one year before the adoption petition was filed.

## Mother's Assignment of Error

{¶ 57} Mother argues her consent to the adoption of B.L. is required since her lack of contact with him for more than one year before the adoption petition was filed was justified because the juvenile judgment was more like a no-contact order and father and step-mother interfered with her contact with B.L. Mother submits father and step-mother moved several times without notifying mother or the court, father's address was listed as confidential with the court, and B.L.'s school district changed without notifying mother.

{¶ 58} Concerning child support payments, mother believed additional amounts were deducted from her check.

## Law and Burden of Proof

{¶ 59} R.C. 3107.07(A) provides that parental consent to an adoption is not required:

16.

when it is alleged in the adoption petition and the court * * * finds

by clear and convincing evidence that the parent has failed without

justifiable cause to provide more than de minimis contact with the minor **or**

to provide for the maintenance and support of the minor as required by law

or judicial decree for a period of at least one year immediately preceding

either the filing of the adoption petition or the placement of the minor in the

home of the petitioner.  (Emphasis added.)

{¶ 60} In *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, 963 N.E.2d 142, ¶ 23, the Ohio Supreme Court determined probate courts must undertake a two-step analysis when applying R.C. 3107.07(A).

{¶ 61} In the first step, the probate court decides the factual question of whether the petitioner has proved, by clear and convincing evidence, that the parent willfully failed to have more than de minimis contact with the minor child or failed to provide maintenance and support.  *Id.* at ¶ 21; R.C. 3107.07(A).  An appellate court reviewing this decision applies an abuse-of-discretion standard.  *Id.* at ¶ 25.

{¶ 62} In the second step, if the probate court has found the parent failed to have more than de minimis contact or provide the required maintenance and support, the probate court then determines whether the petitioner has proved, by clear and convincing evidence, that there is no justifiable cause for the failure.  *Id.* at ¶ 23; *In re Adoption of K.A.H.*, 10th Dist. Franklin No. 14AP-831, 2015-Ohio-1971, ¶ 7.  If the petitioner has made this showing, the burden of going forward with evidence shifts to the parent to

17.

show some facially justifiable cause for the failure. *In re Adoption of Bovett*, 33 Ohio St.3d 102, 515 N.E.2d 919 (1987), paragraph two of the syllabus. However, the burden of proving a lack of justifiable cause remains on the petitioner. *In re Adoption of M.G.B.-E.*, 154 Ohio St.3d 17, 2018-Ohio-1787, 110 N.E.3d 1236, ¶ 39. Generally, a parent has justifiable cause for failing to communicate with the child if the other parent significantly discourages or interferes with communication or contact. *Id.* This determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Adoption of M.B.* at ¶ 24.

{¶ 63} The consent provisions of R.C. 3107.07(A) are to be strictly construed in order to protect the interests of the non-consenting parent. *In re Adoption of Sunderhaus*, 63 Ohio St.3d 127, 132, 585 N.E.2d 418 (1992).

**Standards**

{¶ 64} Clear and convincing evidence is a degree of proof which is more than a preponderance of the evidence but is not to the extent of such certainty required beyond a reasonable doubt in criminal cases, and which produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 65} An abuse of discretion indicates the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

18.

{¶ 66} "A manifest weight of the evidence challenge contests the believability of the evidence presented." (Citation omitted.) *State v. Wynder*, 11th Dist. Ashtabula No. 2001-A-0063, 2003-Ohio-5978, ¶ 23. A determination is not against the manifest weight of the evidence when it is supported by competent, credible evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

### Analysis

### Contact

{¶ 67} Upon review, the record shows step-mother filed the adoption petition on October 4, 2019, and mother acknowledged she had no contact with B.L. since 2016 or 2017. We therefore find the probate court did not abuse its discretion in finding mother had no contact with B.L. for more than one year before the adoption petition was filed.

### Justification

{¶ 68} Mother contends the juvenile court's no-visitation order is more akin to a no-contact order, thus her lack of contact with B.L. was justified.

{¶ 69} In *In re Adoption of T.U.*, 2020-Ohio-841, 152 N.E.3d 943 (6th Dist.), we noted the distinction between a no-visitation order and a no-contact order is important.

> A "no-visitation" order prevents a parent from having parenting time with the child, while a "no-contact" order prohibits all contact and communication with the child. While a "no-contact" order can provide justifiable cause for a parent's failure to have more than de minimis contact with the child under R.C. 3107.07(A), a "no-visitation" order does not

provide justifiable cause. *In re Adoption of T.R.S.*, 7th Dist. Belmont No. 13 BE 43, 2014-Ohio-3808, ¶ 20. This is because "visitation does not equate with communication * * *." *In re Adoption of C.A.L.*, 2015-Ohio-2014, 35 N.E.3d 44, ¶ 30 (12th Dist.). That is, "a parent can communicate with a child 'notwithstanding the inability to physically visit with the child.'" *Id.*, quoting *In re Adoptions of Doyle*, 11th Dist. Ashtabula Nos. 2003-A-0071 and 2003-A-0072, 2004-Ohio-4197, 2004 WL 1778821, ¶ 17. *Id.* at ¶ 27.

{¶ 70} Here, upon review, the juvenile judgment addressed mother's parenting time, and was a no-visitation order. Moreover, the record shows mother had contact with B.L. after the juvenile judgment was issued in 2015, as she testified that she spoke with B.L. on the phone in 2016 or 2017. Thus, we find the juvenile judgment suspending mother's visitation with B.L. until she met certain conditions was not a no-contact order, and it did not provide justification for mother's failure to have contact with B.L. in the year before the adoption petition was filed.

{¶ 71} Mother also argues father and step-mother interfered with her contact with B.L. because father moved without notifying the court, father had his address listed as confidential on the juvenile judgment and father changed B.L.'s school district without informing her. In addition, mother claims she was blocked on Facebook and did not have father or step-mother's phone numbers.

20.

{¶ 72} Upon review, the record shows the majority of these events did not occur within the one-year look back period set forth in R.C. 3107.07(A), which was October 4, 2018 to October 4, 2019. The juvenile judgment listing father's address as confidential was issued in 2015. Father has had his current phone number since 2015, while step-mother has had her phone number since she was 13 years old; both testified they provided their numbers to mother. Since the 2016-2017 school year, B.L. has been enrolled in his current school district; and step-mother blocked mother on Facebook long ago.

{¶ 73} Regarding events which may have occurred within the one-year look back period of October 4, 2018 to October 4, 2019, there is no indication in the record as to when father blocked mother on Facebook. However, mother failed to show how this caused her lack of contact with B.L. for the year before the adoption petition was filed.

{¶ 74} With respect to father and step-mother's current address, father admitted he did not notify the court of his change of address when he and step-mother purchased their home in July 2018, and where they have lived since 2019. Yet, the record reveals both father and step-mother's names are on the deed to the home, and step-mother, who has been a registered voter since she was 18 years old, testified she keeps her voting record up-to-date with her address. Although mother testified she conducted searches in 2019, to see if step-mother owned a home in her name, and found 11 records, mother did not bring the results of the search with her to court. Mother agreed it was unknown if step-mother's current address was in the results.

21.

{¶ 75} Based on the foregoing, step-mother met her burden of proving there was no justifiable cause for mother's failure to have contact with B.L. for more than one year before the adoption petition was filed. Further, mother did not come forward with evidence to show some facially justifiable cause for her failure to have contact with B.L. for the year preceding the filing of the adoption petition. We therefore conclude the probate court's finding, by clear and convincing evidence, that mother failed without justification to have contact with B.L. for more than a year before the adoption petition was filed is not against the manifest weight of the evidence.

### Support

{¶ 76} The probate court also found mother failed without justifiable cause to provide for the support and maintenance of B.L., as required by law or judicial decree, for at least one year before the adoption petition was filed.

{¶ 77} Upon review, mother testified she worked continuously from October 4, 2018 to October 4, 2019, and thought she was paying child support regularly during that time, although she was unaware if the full amount of child support was taken out of her paycheck. She also believed additional amounts were deducted from her check.

{¶ 78} In *In re Adoption of A.C.B.*, 159 Ohio St.3d 256, 2020-Ohio-629, 150 N.E.3d 82, the Ohio Supreme Court reviewed the "as required by law or judicial decree" language set forth in R.C. 3107.07(A). The court stated:

22.

The starting point -- and because the language is clear, the ending point -- for our analysis is the text of the statute. The plain text of R.C. 3107.07(A) instructs a trial court to determine whether a natural parent provided maintenance and support "as required by law or judicial decree" for a period of at least one year immediately preceding the filing of the adoption petition. *Id.* at ¶ 8.

{¶ 79} The court further stated:

[T]he judicial decree sets forth precisely what father was required to pay: $85 per week, for a total of $4,420 over the course of a year. Father did not pay what the judicial decree required. He paid only $200 for the entire year before stepfather filed the adoption petition. Thus, under the plain language of the statute, father did not "provide for the maintenance and support" of A.C.B. "as required by law or judicial decree" for the requisite one-year period. *Id.*

{¶ 80} Here, the record shows mother was ordered to make monthly child support payments for B.L. of $80.92 ($67.43, plus $13.49 towards the arrearage). The probate court found in the year before the adoption petition was filed, mother paid 31 percent of the required child support payments and 50 percent of the required payments on her arrearage. Thus, the record reveals mother did not make the support and arrearage payments required by the juvenile judgment. Therefore, on the authority of *In re Adoption of A.C.B.*, we conclude the probate court did not abuse its discretion in finding

23.

mother had the ability to make 100 percent of her support obligations for the year before the adoption petition was filed, but she did not do so.

{¶ 81} We further conclude mother did not meet her burden of showing some justification for her failure to provide for the support and maintenance of B.L., as required by law or judicial decree, for the one-year period before the adoption petition was filed.  Thus, we concluded the probate court's determination that mother failed without justifiable cause to have to provide for the support and maintenance of B.L. as required by law or judicial decree for at least one year before the filing of the adoption petition is not against the manifest weight of the evidence.

{¶ 82} In light of the foregoing, the probate court did not err in finding mother's consent to the adoption of B.L. by step-mother was not required.  Accordingly, mother's assignment of error is not well-taken.

{¶ 83} On consideration whereof, the judgment of the Huron County Court of Common Pleas, Probate Division, is affirmed.  Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____

_____
JUDGE

Thomas J. Osowik, J. _____

_____
JUDGE

Myron C. Duhart, J. _____
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.