[Cite as *In re Adoption of T.U.*, 2020-Ohio-841.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY


In re Adoption of T.U.                    Court of Appeals No.  WM-19-012

                                          Trial Court No.  20195009



                                          **DECISION AND JUDGMENT**

                                          Decided:  March 6, 2020

* * * * *

Tyler E. Cantrell, for appellant.

John S. Shaffer, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, M.C. ("father"), appeals the July 2, 2019 judgment of the

Williams County Probate Court finding that his consent to the adoption of his natural

child, T.U. ("the child"), by appellee, M.U. ("stepfather"), was not required.  For the

following reasons, we affirm.

## I.    Background and Facts

{¶ 2} On April 23, 2019, stepfather petitioned the trial court to adopt the child.[1]  In his petition, he alleged that, under R.C. 3107.07(A), father was not required to consent to the adoption because he had failed, without sufficient justification, to have more than de minimis contact with the child and to provide support to the child for at least one year prior to stepfather filing the petition.

{¶ 3} On July 2, 2019, the probate court held a hearing on whether father's consent to the adoption was required.  Father, stepfather, and S.U., the child's mother, each testified at the hearing.

{¶ 4} Mother and father were married until 2012.  In September 2012, after their divorce was finalized (and after mother and stepfather began living together), mother and father reached an agreement under which father would pay no child support in exchange for giving up visitation with the child, with the understanding that stepfather would eventually adopt the child.  Mother also agreed to waive father's child support arrears. The zero-dollar support order was in effect at the time of the consent hearing.

{¶ 5} Mother and stepfather testified that father did not provide any financial support, including gifts, to the child after the 2012 domestic relations court order was

---

[1] Stepfather also petitioned to adopt N.U., T.U.'s sibling and father's natural child. Father failed to perfect his appeal of the trial court's decision in N.U.'s case, however, so father's consent to N.U.'s adoption is not at issue in this appeal.

2.

filed. Father said that he obeyed the child support order and paid no child support, but he would have helped if mother had made him aware that the child needed something.

{¶ 6} Mother also said that father had not contacted the child in the five years prior to stepfather filing the petition to adopt the child. Although she had the same phone number that she did when she and father were married, she had not received any phone calls or text messages from father. Nor had she received any cards or letters from father. When mother first moved to Williams County, she lived with her parents, whose address father knew. She did not give father any of her subsequent addresses because she and father did not have any contact, but mother believed that it was "very easy to find out" where she lived.

{¶ 7} On cross, mother admitted that her parents had received a letter from father to the child sometime "after we had sent him adoption papers," but she did not know if father sent the letter before or after stepfather filed the adoption petition. According to stepfather, father sent "some kind of generic letters" saying that father had no way of contacting the child. Although stepfather said that he and mother learned about the letter after stepfather filed the adoption petition, he was not sure when father sent the letter. Mother did not respond to the letter because she knew that the parties would be in court for the adoption proceedings.

{¶ 8} Father testified that he had not seen the child since July or August of 2012. He confirmed that he knew where mother and the child were living then. Mother did not,

3.

however, give him any of her subsequent addresses. He claimed that he had attempted to call and send text messages to mother, but was unsuccessful because "apparently the numbers I remembered was not the numbers that they have because I got someone else when I tried to call[.]" He also unsuccessfully searched for the child on social media sites.

{¶ 9} Father explained that he did not have contact with the child because mother "didn't want me to have any contact visitation with the children, after what happened back in, well the divorce in Two Thousand and Twelve [sic]. That was the agreement that I give up the, the visitation and all that and all communication. That's what I was informed of, ummm, and forced to by their mother." Father acknowledged that the no-contact order from the domestic relations court was "[n]ot permanent, but at the time, indefinite" and said that he did not ask the domestic relations court to reinstate his parenting time because "I hadn't seeked [sic] a lawyer to find out because I was having financial issues and job issues, so I wanted to make sure that I had the finances and resources to do so[.]" He also admitted that he only sought legal counsel after receiving a letter from stepfather's attorney seeking father's consent to adoption of the child.

{¶ 10} Father's first successful contact with the child was in April 2019 when he sent a letter to the child, at maternal grandparents' address, by certified mail. The return receipt for the letter showed a delivery date of April 11, 2019. Father recalled that the letter said "I was not able to get in contact with them because I had no contact with their

4.

mother, their mother had made no contact with me letting me know any, ahh, address change were successful, so I had no as to where of at the time to call or get a hold of * * *" the child. He put his name and contact information in the letter, but did not receive a response. In addition to the April letter, father testified that he sent cards to the child and that "the first round was, the second round was not signed for * * *."

{¶ 11} After hearing the testimony, the trial court found that stepfather had shown by clear and convincing evidence that father's consent to the adoption was not required because father had failed without justifiable cause to communicate with the child or to provide more than de minimis support. The court reasoned that "a party in a divorce proceeding may waive support, [but] that does not extinguish the legal obligation to support." Further, father agreed to have no contact with the child and, in exchange, he had not paid $800 per month in child support for seven years. The court determined that father "gained a significant benefit from relinquishing those things."

{¶ 12} Father now appeals, raising one assignment of error:

> The Court erred in finding that the Father's consent was not required
> for the adoption[.]

## II.    Law and Analysis

{¶ 13} In his assignment of error, father raises two arguments. In the first, he argues that the trial court incorrectly determined that his failure to provide support for the child was unjustified, despite the zero-dollar support order, because a parent is not

required to provide any support beyond what is in a child support order—even if the amount in the child support order is zero. In his second argument, father contends that the domestic relations court order is sufficient justification for his failure to have more than de minimis contact with the child for the year before stepfather filed the petition for adoption. Stepfather counters that father's voluntary relinquishment of his right to see the child does not constitute sufficient justification for father's lack of contact.

{¶ 14} Whether a parent is required to consent to the adoption of his child is controlled by R.C. 3107.07. A parent's consent is not required if the person petitioning for the adoption alleges in the adoption petition, and, after a hearing, the probate court finds by clear and convincing evidence that "the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner." R.C. 3107.07(A). We strictly construe exceptions to the requirement of parental consent to adoption in order to protect the rights of natural parents. *In re Adoption of P.L.H.*, 151 Ohio St.3d 554, 2017-Ohio-5824, 91 N.E.3d 698, ¶ 23.

{¶ 15} The petitioner must prove by clear and convincing evidence that the parent's consent is not required. R.C. 3701.07(A). To meet this burden, the petitioner must present competent and credible evidence sufficient for the court to form a firm

6.

conviction or belief that the parent unjustifiably failed to support or contact the child. *In re Zachary V.*, 6th Dist. Wood No. WD-01-039, 2002 WL 27514, *1 (Jan. 11, 2002), citing *C.E. Morris v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus, and *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. After the petitioner makes this showing, the burden shifts to the parent to show a "facially justifiable" cause for the failure. *In re Adoption of B.G.*, 6th Dist. Erie Nos. E-10-024 and E-10-025, 2010-Ohio-5025, ¶ 15, citing *In re Adoption of Bovett*, 33 Ohio St.3d 102, 515 N.E.2d 919 (1987), paragraph two of the syllabus. Regardless, the burden of proof remains with the petitioner, who must establish the lack of justifiable cause by clear and convincing evidence. *Id.*

{¶ 16} The probate court engages in a two-step process to determine when a parent's consent is not required based on his failure to support the child. First, the court must determine whether the parent complied with his support obligations during the year preceding the filing of the adoption petition. *In re Adoption of B.I.*, 157 Ohio St.3d 29, 2019-Ohio-2450, 131 N.E.3d 28, ¶ 15. Inherent in this first step is a determination of "what the law or judicial decree required of the parent * * *," i.e., how much child support the parent was required to pay. *Id.* Second, if the parent did not comply with his obligations, the court must determine whether he had "justifiable cause" for his noncompliance. *Id.*

7.

{¶ 17} The probate court engages in a similar two-step process to determine when a parent's consent is not required based on his failure to have more than de minimis contact with the child. *In re Adoption of B.V.K.M.*, 6th Dist. Lucas No. L-18-1137, 2019-Ohio-1173, ¶ 23. First, the court determines whether the parent failed to have more than de minimis contact with the child in the year preceding the filing of the adoption petition. *Id.* And second, if the parent's contact with the child does not rise above the level of "de minimis," the court must determine whether he had "justifiable cause" for his lack of contact. *Id.*

{¶ 18} We review the probate court's factual determination of whether the parent complied with his support obligations or had more than de minimis contact with the child for an abuse of discretion. *Id.* at ¶ 22, 23. A decision is an abuse of discretion when it is "'contrary to law, unreasonable, not supported by the evidence, or grossly unsound.'" *Moton v. Bailey*, 6th Dist. Lucas No. L-19-1122, 2019-Ohio-5365, ¶ 24, quoting *State v. Nisley*, 3d Dist. Hancock No. 5-13-23, 2014-Ohio-981, ¶ 16.

{¶ 19} We review the probate court's justifiable-cause determination under a manifest-weight-of-the-evidence standard. *B.V.K.M.* at ¶ 22, 23. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541

8.

(1997). But while we review the evidence and consider the witnesses' credibility, we must be mindful that the trial court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20.

### A. Father met his support obligation by complying with the zero-dollar child support order.

{¶ 20} Father first argues that paying no child support pursuant to a zero-dollar support order does not obviate the need for his consent to the child's adoption. We agree.

{¶ 21} In *In re Adoption of B.I.*, 157 Ohio St.3d 29, 2019-Ohio-2450, 131 N.E.3d 28—decided one week before the trial court issued its decision in this case—the Supreme Court of Ohio held that R.C. 3107.07(A) does not eliminate the need to obtain a parent's consent to adoption if the parent pays no child support based on a court order relieving the parent of any child support obligation. *Id.* at ¶ 43. The court arrived at that conclusion because a parent has either a general statutory obligation to support his child under R.C. 3103.03(A) (stating that "[t]he biological or adoptive parent of a minor child must support the parent's minor children out of the parent's property or by the parent's labor") *or* a specific, court-imposed obligation under R.C. 3109.05(A)(1) (stating that "[i]n a divorce, dissolution of marriage, legal separation, or child support proceeding, the court may order either or both parents to support or help support their children * * *") and R.C. Chapter 3119, which governs child support orders. *Id.* at ¶ 27. "Once issued, the child-support order determines what the parent's obligation is." *Id.* at ¶ 26.

9.

{¶ 22} Here, we are faced with precisely the same situation as the court in *B.I.* Although father did not provide any financial support for the child in the year before stepfather filed the petition for adoption, he did so based on the domestic relations court order setting his child support obligation at zero. By complying with the zero-dollar support order, father "provide[d] for the maintenance and support of the minor *as required by law or judicial decree * * *,*" so R.C. 3107.07(A) did not allow the adoption to proceed without father's consent. (Emphasis added.) *B.I.* at ¶ 43. And contrary to the trial court's finding that mother's waiver of child support "does not extinguish [father's] legal obligation to support," father had only *one* duty to support the child: the duty outlined in the domestic relations court order. The trial court erred by finding otherwise.

{¶ 23} Regardless, the trial court's error was harmless. As discussed below, father's failure to have more than de minimis contact with the child was unjustified, and "[b]ecause R.C. 3107.07(A) is written in the disjunctive, either a failure to communicate or a failure to provide support for the one-year time period is sufficient to obviate the need for a parent's consent." *In re Adoption of A.H.*, 9th Dist. Lorain No. 12CA010312, 2013-Ohio-1600, ¶ 9, citing *In re Adoption of McDermitt*, 63 Ohio St.2d 301, 304, 408 N.E.2d 680 (1980). Accordingly, we find that father's first argument is without merit.

### B. Father's voluntarily agreement to a no-contact order did not justify his lack of contact with the child.

{¶ 24} Father also argues that the domestic relations court order provides justifiable cause for his lack of contact with the child. We disagree.

10.

{¶ 25} While not statutorily defined, "more than de minimis contact" implies contact—either attempted or successful—beyond a single occurrence. *In re J.D.T.*, 2012-Ohio-4537, 978 N.E.2d 602, ¶ 9 (7th Dist.). That is, the statute demands "more quality and quantity" and requires "more effort from the parent to have contact and communication with the child" than is shown by one-time contact. *In re Adoption of K.A.H.*, 10th Dist. Franklin No. 14AP-831, 2015-Ohio-1971, ¶ 10. Based on the hearing testimony, it appears that father's contact with the child in the year before stepfather filed the adoption petition consisted of: (1) some unknown number of unsuccessful attempts to call and text message mother at some unknown time (father testified to making "attempts," but did not say when he did so or how many times he tried); (2) sending one letter to the child after father knew that stepfather was seeking to adopt the child and approximately two weeks before stepfather filed the petition; and (3) sending one card, or possibly two (father alluded to a "first round" and "second round" of cards, but it is unclear whether "first round" referred to the letter father sent or to mailing a card), to the child sometime after sending the letter. Even construing these facts in father's favor, this does not rise above the level of de minimis contact. Thus, we conclude that the trial court did not abuse its discretion by finding that father failed to provide more than de minimis contact in the year prior to the filing of the adoption petition.

{¶ 26} Father does not argue that his contact with the child was more than de minimis, however, but focuses on his lack of contact being sufficiently justified. He

11.

argues that the "no-contact" provision in the domestic relations court order provided the justification for his lack of contact with the child.

{¶ 27} Preliminarily, we note that it is unclear from the record what, exactly, the domestic relations court order prohibited father from doing, i.e., visiting the child or having any contact with the child. The distinction is important. A "no-visitation" order prevents a parent from having parenting time with the child, while a "no-contact" order prohibits all contact and communication with the child. While a "no-contact" order can provide justifiable cause for a parent's failure to have more than de minimis contact with the child under R.C. 3107.07(A), a "no-visitation" order does not provide justifiable cause. *In re Adoption of T.R.S.*, 7th Dist. Belmont No. 13 BE 43, 2014-Ohio-3808, ¶ 20. This is because "visitation does not equate with communication * * *." *In re Adoption of C.A.L.*, 2015-Ohio-2014, 35 N.E.3d 44, ¶ 30 (12th Dist.). That is, "a parent can communicate with a child 'notwithstanding the inability to physically visit with the child.'" *Id.*, quoting *In re Adoptions of Doyle*, 11th Dist. Ashtabula Nos. 2003-A-0071 and 2003-A-0072, 2004-Ohio-4197, ¶ 17.

{¶ 28} Here, neither party put the domestic relations order in the record, so we only have the parents' testimony about their agreement. Mother testified that father agreed to "giving up visitation" in exchange for mother "giv[ing] up" child support and waiving father's child support arrears. Father testified that mother did not want him to have "contact visitation with the children" and that their agreement required him to "give

12.

up the, the visitation and all that and all communication." This testimony is far from conclusive regarding the terms of the parents' agreement. However, because we are required to strictly construe the consent exceptions in R.C. 3107.07 in favor of protecting a natural parent's rights, *P.L.H.*, 151 Ohio St.3d 554, 2017-Ohio-5824, 91 N.E.3d 698, at ¶ 23, and stepfather had the burden of proving by clear and convincing evidence that father's lack of contact was unjustified, *B.G.*, 6th Dist. Erie Nos. E-10-024 and E-10-025, 2010-Ohio-5025, at ¶ 15, we will presume that the domestic relations court issued a no-contact order that prohibited father from having any contact or communication with the child.

{¶ 29} Operating under the belief that the domestic relations order was, in fact, a no-contact order, father argues that the existing no-contact order, standing alone, provided sufficient justification for his lack of contact with the child. In support of his argument, he cites *In re Adoption of B.V.K.M.*, 6th Dist. Lucas No. L-18-1137, 2019-Ohio-1173.

{¶ 30} In *B.V.K.M.*, the juvenile court suspended, "in its entirety," the father's contact with the child based on the father's untreated mental health and substance abuse issues. *Id.* at ¶ 10-11. The father complied with the no-contact order and did not have any contact with the child for the year prior to the stepfather filing a petition for adoption. *Id.* at ¶ 17. Relying on an earlier case, *In the matter of Adoption of Bryan W.*, 6th Dist. Huron No. H-96-039, 1997 WL 224968 (May 2, 1997), we found that the juvenile court's

13.

no-contact order, which was in effect during the year prior to the petition being filed, justified father's lack of contact with the child.  *Id.* at ¶ 33.

{¶ 31} In *Bryan W.*, 6th Dist. Huron No. H-96-039, 1997 WL 224968, *1, the juvenile court issued an order barring the mother from "contact or communication, direct or indirect," with the child.  In a split decision (and without significant analysis), we held that the mother was justified in failing to communicate with the child[2] because her contact with the child was prohibited by the no-contact order that was in effect during the lookback period.  *Id.* at *3.

{¶ 32} Father's situation is distinguishable from the parents' situations in *B.V.K.M.* and *Bryan W.*  Crucially, in this case, father *agreed* to have no contact with the child—in exchange for a zero-dollar support order—making his situation more akin to that of the father in *In re Adoption of J.F.M.*, 12th Dist. Butler No. CA2016-03-044, 2016-Ohio-4823.

{¶ 33} In *J.F.M.*, following more than a decade of post-divorce litigation regarding custody of their children, the parents entered an agreement that reduced the father's child support obligation to zero, relieved father of all other financial obligations relating to the children, suspended the father's visitation with the children, and required

---

[2] Until 2009, R.C. 3107.07(A) allowed an adoption to proceed without a parent's consent if the parent "failed without justifiable cause to communicate with" the child for the year prior to the filing of an adoption petition.  Former R.C. 3107.07(A), 2008 Sub.H.B. No. 7.

14.

that the father have no contact with the children. *Id.* at ¶ 4. The father complied with the order and did not provide more than de minimis contact to the children after the agreed entry was filed. *Id.* at ¶ 5. Fifteen months later, the children's stepfather filed a petition to adopt them. *Id.* The probate court determined that the father's consent to the adoption was unnecessary because he unjustifiably failed to have contact with the children in the year prior to the stepfather filing the petition. *Id.* at ¶ 6.

{¶ 34} The father, citing *Bryan W.*, argued on appeal that the no-contact order sufficiently justified his lack of contact and that his consent to the adoption was required. *Id.* at ¶ 12. The Twelfth District found that *Bryan W.* was distinguishable because the father voluntarily agreed to forgo contact with the children and "[u]nlike those cases finding justifiable cause based on the existence of a 'no contact' court order, this matter involved Father's own decision to terminate contact with the children." *Id.* at ¶ 13. And, although the no-contact order was modifiable, the father never attempted to have the order modified so that he could reinitiate contact with the children. *Id.* at ¶ 14. The court concluded that the father's "general reason" for failing to have contact with the children—i.e., the no-contact order—standing alone, was insufficient to show justifiable cause because the father agreed to the no-contact provision and did not seek to have the order modified. *Id.* at ¶ 15.

{¶ 35} Like the Twelfth District in *J.F.M.*, we cannot ignore the fact that father voluntarily agreed to have no contact with his child. This is not a situation where a court

15.

ordered a parent to have no contact with a child because the parent's behavior was potentially dangerous or damaging to the child. *See, e.g., B.V.K.M.*, 6th Dist. Lucas No. L-18-1137, 2019-Ohio-1173 (no-contact order based on the father's untreated mental health and substance abuse issues); *In re Adoption of M.F.*, 9th Dist. Summit No. 27166, 2014-Ohio-3801 (no-contact order based on criminal charges (of which the father was later acquitted) alleging that the father sexually abused the child). Instead, the no-contact order in this case is the direct result of father *voluntarily* giving up his right to see his child in exchange for not having to financially support the child, and, as the trial court found, father "gained a significant benefit" from the arrangement. As the Twelfth District succinctly stated, "[a]greeing to such an arrangement was certainly not justifiable * * *." *J.F.M.*, 12th Dist. Butler No. CA2016-03-044, 2016-Ohio-4823, at ¶ 15. Moreover, father did not put forth any justification other than the no-contact order for his lack of contact with the child.

{¶ 36} Based on these facts, we find that the trial court's determination that father failed without justifiable cause to have more than de minimis contact with the child for the year preceding stepfather filing the petition to adopt the child was supported by the manifest weight of the evidence. Accordingly, father's second argument is not well-taken, and his assignment of error is overruled.

16.

## III.  Conclusion

{¶ 37} Based on the foregoing, the July 2, 2019 judgment of the Williams County Probate Court is affirmed.  Father is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Christine E. Mayle, J.

_____
JUDGE

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

17.