[Cite as *In re Adoption of O.K.M.*, 2021-Ohio-2330.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF: O.K.M. | : |
| | : |
| | :     Appellate Case No. 2021-CA-8 |
| | : |
| | :     Trial Court Case No. 11186AD |
| | : |
| | :     (Appeal from Probate Court) |
| | : |
| | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of July, 2021.

. . . . . . . . . . .

BRIAN A. KRUSE, Atty. Reg. No. 0087411, 10532 Success Lane, Dayton, Ohio 45458
    Attorney for Petitioner-Appellant

BRIAN E. LUSARDI, Atty. Reg. No. 0080294, 85 West Main Street, Xenia, Ohio 45385
    Attorney for Respondent-Appellee

. . . . . . . . . . . . .

TUCKER, P.J.

**{¶ 1}** Petitioner-appellant, M.M., appeals from an order of the Greene County Court of Common Pleas, Probate Division, which found that she needed consent from her minor stepson's mother before she could proceed with an adoption. For the reasons that follow, we affirm.

## I.      Facts and Procedural History

**{¶ 2}**  Mother and Father are the biological parents of O.K.M., who was born in August 2016. Mother and Father were never married, and their relationship ended in 2017.[1]

**{¶ 3}** It is undisputed that Mother had a substance abuse problem. Therefore, in 2018, Father was awarded legal custody of O.K.M. by the Greene County Common Pleas Court, Juvenile Division. The court granted Mother supervised visitation which was to take place at the Greene County Visitation Center. Although the visitation order is not a part of the record before us, the evidence presented indicates it did not provide for contact by telephone, nor any other type of contact, between Mother and O.K.M.

**{¶ 4}** As a result of her substance abuse, Mother incurred legal problems which caused her to be jailed at some point in 2018. She was also subsequently jailed in March 2019. Mother transferred from jail to a treatment center. Following her successful completion of treatment, Mother was released on October 31, 2019.[2]

---

[1] The record indicates that Father was married to another woman whom he had wed in 2015 at the time of his relationship with Mother. Father had one child as a result of that union. That marriage ended by divorce in August 2018. Father and M.M. were married in September 2018.

[2] The record supports a finding that Mother has not used drugs since her release, that she has obtained gainful employment, and that she successfully completed her probation.

{¶ 5} On November 1, 2019, Mother contacted the Greene County Visitation Center in an attempt to set up visitation with O.K.M. Despite the fact that the Center's records indicated that it had closed its files in February 2019 because it had not been able to contact Mother, a Center staff member told Mother that the Center would contact Father regarding her request. The record shows the Center called Father on November 4, 2019 and left a message regarding Mother's request. The next day, Father called the Center and stated he needed to contact his attorney before providing a response.

{¶ 6} In August 2019, Mother's stepmother, C.W., asked Father by Facebook if she (C.W.) and her husband could visit with the child, to no avail. On December 13, 2019, C.W. texted Father asking for visitation on Mother's behalf. In the text, C.W. stated that Mother "would like to visit" with the child during the holiday season. Exh. C. The text went on to state that Mother was living with C.W., had obtained a job, and was "doing very well." *Id*. C.W. had also previously On December 19, 2019, Mother went to Father's home in order to deliver Christmas presents for the child. She did not attempt contact with the child during the delivery. C.W. texted Father again on December 23, 2019, asking Father to reply to her prior text.

{¶ 7} Father replied to the Visitation Center on December 27, 2019. The Center's records state that Father "denied visits stating upon advice of counsel." Tr. p. 29, Exh. B. Thereafter, on January 6, 2020, C.W. texted Father and indicated that she was disappointed to learn he had declined visitation with Mother. The text again indicated Mother was doing well and that she deserved a "second chance." Exh. D. Father did not reply to any of C.W.'s texts.

{¶ 8} On July 26, 2020, as the child's birthday approached, Mother contacted

Father via the social media platform Instagram. In the message, Mother stated, "Hey, I'm not asking to see him. Even though that would mean the world to me. All I am asking is for you to tell me what he likes, his sizes (clothing and shoes) so I can get him a few things for his birthday." Exh. 1. Thereafter, Father blocked Mother from his Instagram account without responding to her communication. Mother went to Father's home shortly before the child's birthday in order to drop off birthday presents; however, no one was home. She then went to Father's home in September 2020 and was able to drop off the presents. She did not attempt to see the child at that time.[3]

{¶ 9} On September 22, 2020, M.M. filed a petition for adoption of O.K.M. in which she alleged that Mother's consent was not required because Mother had failed to support or communicate with the child for one year preceding the filing of the petition.

{¶ 10} The probate court held a hearing on the petition on December 16, 2020. At the outset of the hearing, M.M. voluntarily dismissed her claim that Mother had failed to support the child and elected to proceed solely on the issue of communication. After hearing testimony from three witnesses, the court found that M.M. had failed to disprove Mother's claim of justifiable cause for her lack of communication during the one-year period. The probate court stated:

> If the preponderance of the evidence standard applied to this case, it would be very difficult to decide. The Court sees the evidence equally persuasive on both sides of the justifiable cause issue. In the Court's view, that

---

[3] When questioned about why she did not attempt to see the child either time she took him presents, Mother responded that she was not entitled to see O.K.M. without Father's permission, and "I didn't know if [Father] was going to call the police on me or what my legal rights were. I didn't want to get in any trouble. I wanted to tread lightly." Tr. p. 31-32.

demonstrates the evidence does not rise to the level of clear and convincing. Petitioner bears that burden of proof, not mother. As the trier of fact, it is the opinion of the Court that Petitioner has not sustained that burden.

**{¶ 11}** The probate court thus concluded that Mother's consent was required before any adoption action could proceed.

**{¶ 12}** M.M. appeals.

## II. Justifiable Cause

**{¶ 13}** M.M. raises two assignments of error. The first states:

THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT MOTHER HAD JUSTIFIABLE CAUSE FOR HER LACK OF CONTACT WITH THE CHILD AND, AS A RESULT, THE TRIAL COURT ERRED IN FINDING THAT CONSENT OF MOTHER IS REQUIRED FOR ADOPTION.

**{¶ 14}** M.M. asserts that the probate court erred in finding Mother had justifiable cause for her failure to communicate with the child during the one-year period.

**{¶ 15}** We have recently addressed the legal standards to be utilized in reviewing adoption cases involving the issue of justifiable cause in *In re Adoption of R.A.H.*, 2d Dist. Champaign No. 2020-CA-32, 2021-Ohio-1667, wherein we stated:

The right of a biological parent to the care and custody of his or her children is fundamental and not easily extinguished. *Santosky v. Kramer*, 455 U.S. 745, 753-754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Because adoption acts to terminate this fundamental right, a biological parent must

be afforded every procedural and substantive protection allowed by law before depriving the parent of the right to consent to the adoption of his child. *In re Hayes*, 79 Ohio St.3d 46, 679 N.E.2d 680 (1997); R.C. 3107.15. To that end, R.C. 3107.06 permits a court to grant a petition to adopt only if written consent has been executed by the mother and father of the child.

However, exceptions to the consent requirement are set forth in R.C. 3107.07(A), which provides that consent to an adoption is not required when a court finds by clear and convincing evidence that the parent has failed, without justifiable cause, to have more than de minimus contact with the child or to provide maintenance and support for the child in the one-year period immediately preceding the filing of an adoption petition. These exceptions to the requirement of parental consent to adoption must be strictly construed in favor of the biological parent so as to protect his or her fundamental right to parent a child. *In re Adoption of M.G.B.-E.*, 154 Ohio St.3d 17, 2018-Ohio-1787, 110 N.E.3d 1236, ¶ 40, citing *In re Schoeppner*, 46 Ohio St.2d 21, 24, 345 N.E.2d 608 (1976).

Thus, the party petitioning for adoption has the burden to prove, by clear and convincing evidence, that one of the consent exceptions is applicable. *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613 (1985), paragraph four of the syllabus. Clear and convincing evidence is that which produces "in the mind of the trier of fact[ ] a firm belief or conviction as to the facts sought to be established.' " *Id.* at 368, citing *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1984), paragraph three of

the syllabus. Once the petitioner has established by clear and convincing evidence that the biological parent has failed to have more than de minimus contact with or provide support for the child within one year of the petition filing date, the burden of going forward with evidence shifts to the biological parent to show some facially justifiable cause for the failure. *In re Adoption of Bovett*, 33 Ohio St.3d 102, 515 N.E.2d 919 (1987), paragraph two of the syllabus. The burden of proof, however, remains at all times with the petitioner, who must establish the lack of justifiable cause by clear and convincing evidence. *Id.*

* * *

The term "justifiable cause" is not defined in R.C. 3107.07. However, it has been defined as meaning "[c]apable of being legally or morally justified; excusable; defensible." (Citations omitted.) *In re Adoption of B.I.*, 2017-Ohio-9116, 101 N.E.3d 1171, ¶ 10 (1st Dist.), *aff'd*, 157 Ohio St.3d 29, 2019-Ohio-2450, 131 N.E.3d 28, ¶ 10. The Ohio Supreme Court has "refused to adopt a 'precise and inflexible meaning' for 'justifiable cause,' but instead has concluded that 'the better-reasoned approach would be to leave to the probate court as finder of fact the question of whether or not justifiable cause exists.' " *In the Matter of Adoption of D.D.G.*, 2d Dist. Montgomery No. 27741, 2018-Ohio-35, ¶ 5, quoting *In re Adoption of W.K.S.*, 2d Dist. Champaign No. 2014-CA-16, ¶ 22, citing *Holcomb* at 367. The Supreme Court has further held that an important consideration regarding justifiable cause is the parent's willingness and ability to support

or contact a child.    * * *

We review the probate court's decision under a manifest weight standard which requires us to weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the probate court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re Adoption of J.L.*, 1st Dist. Hamilton No. C-180453, 2019-Ohio-366, ¶ 25. Importantly, we must be mindful that the probate court, as the trier of fact, is in the best position to observe the demeanor of the parties, to assess their credibility, and to determine the accuracy of their testimony. *Id.*

*Id.* at ¶ 10-15.

{¶ 16} There is no dispute that Mother had no contact with the child in the year preceding the filing of the adoption petition. Thus, the sole issue before us is whether the probate court reasonably found that M.M. had failed to prove by clear and convincing evidence that Mother did not have justifiable cause for her failure to have such contact.

{¶ 17} Mother's undisputed testimony and the Visitation Center records demonstrate that she contacted the Visitation Center to establish visitation the day after she was released from her treatment program on October 31, 2019. The Center called Father on November 4, 2019 and left a message for him concerning Mother's wish to have visitation. Father returned the call the next day and told the Center he needed to consult with his attorney. Father did not contact the Center again until December 27, 2019, at which time he stated that his attorney had advised him to deny visitation.

**{¶ 18}** When questioned about his reason for unilaterally denying court-ordered visitation, Father testified, "I told them after [consulting] with my counsel, along with them telling me the case had been closed in February of 2019, that we had all agreed that it needed to go back and the court order needed to be revised or just renewed by the judge and by the Court." Tr. p. 42. However, the records from the Center do not corroborate Father's claim that he informed the Center of his view that a new court order was needed. Further, Mother denied, and the record contains no evidence to demonstrate, that Mother was informed of any need to obtain a new court order.

**{¶ 19}** The record also shows that Mother's stepmother, C.W., acting on Mother's behest, attempted contact with Father via texts in order to establish visitation between Mother and the child.[4] However, Father failed to respond to any of C.W.'s three texts and, indeed, he admitted he blocked C.W. from his phone after her January 6, 2020 text, which he found "offensive" because it "insult[ed] [him] as a man."[5] Tr. p. 50. Father also testified that he did not respond to C.W.'s messages because he thought it would cause "[c]onflict of some sort. Definitely two sides not seeing the same outcome, um, and I think that it would've ultimately landed myself and my son in a very uncomfortable, very unsecured situation if I had agreed to any type of visits outside of that Level 1 Visitation Center * * *." Tr. p. 44-45. He further testified that he did not respond because "there was no court involvement. There was no updates to any orders. There was no - - I

---

[4] Father argues that the evidence only supported a finding that C.W. was attempting to secure visitation for herself, rather than acting on Mother's behalf. We disagree and find this to be a mischaracterization of the evidence presented.

[5] The message to which Father refers stated in part that C.W. was "disappointed to learn that [Father was] not going to participate in the [Visitation Center] visitation of [O.K.M.] and [Mother]. That is not the kind of man that I thought you were." Exh. C.

guess just comprehensible reason[ ] as to why I [would] need to or why I would agree to a visit not under the secured parameters of the previously stated court order that never got used a single time." Tr. p. 46.

{¶ 20} Father also testified that he maintained open lines of communication with Mother and her family from the time he was awarded custody of O.K.M. However, he went on to testify that he "did not hear a word for two plus years from anyone, * * * not * * * one call, not * * * one text, not one message prior to [C.W.'s Facebook message] in August of 2019. And like I said, had that been a constant line of communication with the door I opened to them at that time, things probably would've been a different story, but I hadn't spoke [sic] to them in well over two years." Tr. p. 50. But the record shows Father blocked C.W.'s access to his Facebook account.

{¶ 21} Finally, Mother attempted to contact Father via Instagram, but Father did not respond to the message and, indeed, blocked her access to the account. When questioned why he did not respond, Father testified that he did not "feel it appropriate to be discussing our child through a social media platform when there's calls, text messages, and face-to-face conversations that can be had." Tr. p. 44. However, the record also shows Mother attempted to contact Father via Instagram because she was blocked from his Facebook account and his phone.

{¶ 22} Father asserted, despite Mother's claims to the contrary, that he did not block her access to his telephone and she could have contacted him by phone. However, given his actions in blocking C.W. from Facebook and blocking Mother from Instagram, combined with his statement about the open lines of communication, which seemed to imply those lines were subsequently closed because no one had contacted

him for two years, the probate court could have inferred that Father had no intention of communicating with Mother or providing access to the child.

{¶ 23} Although Mother could have done more to pursue communication, such as filing a motion in the juvenile court, the record supported a finding that Father intentionally interfered with Mother's visitation rights by unilaterally denying Visitation Center visits. The testimony presented by Father did nothing, in our opinion, to dispel this conclusion. Moreover, the record supported the conclusion that Father denied Mother any other means of contact with him or the child.

{¶ 24} Upon review of the record, we cannot conclude that the probate court's finding that Mother's consent was required before the adoption action could proceed was against the manifest weight of the evidence.

{¶ 25} The first assignment of error is overruled.

### III.   Visitation vs. Communication

{¶ 26} M.M.'s second assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION IN EQUATING VISITATION WITH COMMUNICATION AND FINDING THAT MOTHER HAD JUSTIFIABLE CAUSE WHEN THE VISITATION CENTER DENIED HER VISITS DUE TO HER CASE BEING CLOSED.

{¶ 27} M.M. contends that the probate court erroneously equated visitation with communication.   In support, she cites *In re Adoption of T.U.*, 2020-Ohio-841, 152 N.E.3d 943 (6th Dist.), *In re Adoption of Doyle*, 11th Dist. Ashtabula No. 2003-A-0071, 2004-Ohio-4197, and *In re Adoption of A.L.E.*, 4th Dist. Meigs No. 16CA10, 2017-Ohio-256,

¶ 25, for the proposition that a parent can communicate with a child notwithstanding the inability to physically visit with the child.   In other words, she argues that, even if a parent were not permitted or were otherwise unable to have in person visitation with a child, the parent could still have telephone contact or maintain contact via written letters.

{¶ 28} We find this argument somewhat disingenuous, as the facts in this case differ from the cases cited by M.M.   Specifically, Father's own testimony indicated that the court had limited Mother's contact with the child to visitations occurring at the Visitation Center and did not make a provision for her to have telephone contact.   As stated above, Mother attempted to establish visitation through the Center.   She also attempted to establish visitation outside the Center through C.W.   However, Father unilaterally foreclosed visitation at the Center and intentionally failed to give any response to C.W. regarding setting up other visitation.

{¶ 29} Based upon this record, we conclude the issue of communication and visitation were inextricably intertwined.   Thus, we find no error in the probate court's discussion of these issues.   Accordingly, the second assignment of error is overruled.

## IV.    Conclusion

{¶ 30} Both of M.M.'s assignments of error being overruled, the judgment of the probate court is affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and EPLEY, J., concur.

Copies sent to:

Brian A. Kruse
Brian E. Lusardi
Hon. Thomas M. O'Diam