[Cite as *In re Adoption of A.W.*, 2022-Ohio-3360.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re Adoption of A.W.

Court of Appeals No.  H-22-007

Trial Court No.  AD02021000016

**DECISION AND JUDGMENT**

Decided:  September 23, 2022

* * * * *

Michael B. Jackson, for appellees.

Autumn D. Adams, for appellant.

* * * * *

**ZMUDA, .J.**

## I.      Introduction

{¶ 1} This matter is before the court on the expedited appeal of the April 20, 2022 decision of the Huron County Court of Common Pleas, Probate Division, determining the

consent of appellant, H.L., was not necessary for the proposed adoption of his child, A.W. by A.W.'s maternal aunt, J.W. and her husband, D.W. Finding no error, we affirm.

## II. Facts and Procedural Background

{¶ 2} Appellant, H.L. (father) and C.P. (mother) are the biological parents of A.W., born January 31, 2016. A.W. lived with her father and mother until the fall of 2017, when father was sentenced to a four-year prison term. A.W. remained with mother until late 2017, when Lorain County Children Services placed A.W. in the temporary custody of mother's sister, J.W. On March 2, 2018, A.W. was adjudicated a neglected and dependent child based on both parent's substance abuse, criminal charges and convictions, and inability to provide for A.W.'s needs. A.W. remained in J.W.'s care.

{¶ 3} On August 21, 2018, the Lorain County Juvenile Court granted J.W. legal custody of A.W. By agreement of the parties, supervised visitation was at J.W.'s discretion, and J.W. could designate another person to supervise the visitation. Initially, J.W. permitted mother to have A.W. on designated weekends while she lived with Kristi O., J.W.'s and mother's cousin. J.W. permitted Kristi O. to supervise mother's visitation, and dropped her off to Kristi O, either at the house or at a point halfway between J.W.'s Norwalk home and Kristi O's home. Father remained incarcerated, and had no visitation with A.W., arranged through J.W.

{¶ 4} During the 2018 visits, and unknown to J.W., mother kept father in contact with A.W. Father called Kristi O's home on visitation weekends, and mother held the

2.

phone to A.W. so that father could speak to her.  Father also sent letters or cards to Kristi

O's address.  In November 2018, mother broke off all contact with J.W. and moved from

her cousin's home.  Mother did not reestablish contact with J.W. for over 3 years.

{¶ 5} In 2019, J.W. married D.W. and they built their present home in Greenwich,

about 20 minutes from Norwalk.  J.W. lived at a temporary address, briefly, until

completion of the new home.  J.W. notified the court of her new address only, and not the

temporary address.  J.W. did not send notice to father of either new address.  However,

J.W. maintained the same phone number at all times, and J.W.'s family members,

including mother, knew where J.W. lived.

{¶ 6} After more than a year without contact from either father or mother, J.W.

and D.W. filed a petition for adoption on May 6, 2021.  Father, through counsel, filed a

timely objection.  In November 2021, father was released from prison.

{¶ 7} After J.W. and D.W. filed the adoption petition, mother contacted J.W. and

began spending time with A.W. again.[1]  During the pendency of the proceedings, father

attempted to send a certified letter to J.W.[2]  After J.W. found a note on her door

---

[1] After father was released from prison and reunited with mother, he made no effort to contact or see A.W. until the eve of trial.

[2] Father argues that he sent certified mail in February 2021, prior to the petition for adoption in May 2021.  There is nothing in the record to support this argument.  Instead, J.W. testified that she received certified mail about a month prior to the trial on March 9, *2022*, and her counsel advised her to let communications go through attorneys, "because I had an attorney and he also had an attorney[.]"

3.

requesting signature, she conferred with her counsel who advised her to let the letter go "unclaimed."

{¶ 8} On March 9, 2022, the trial court held a trial on the issue of necessity for consent for the adoption.[3] Father appeared with counsel. Mother did not appear, although she was represented at the trial by counsel.

{¶ 9} On April 22, 2022, the trial court entered its decision, finding no consent necessary for adoption. The trial court found a lack of justifiable cause for father's failure to contact his daughter, stating:

> Conflicting evidence was presented about the efforts [father] made to have contact with [A.W.]. While incarcerated [father] stayed in touch with [mother] and some of [mother's] extended family. It was these persons through whom [father] was able to have some contact with [A.W.]. It has been more than 3 years, however, since [mother] and these family members have had contact with [A.W.]. Despite the lack of communication, the family always knew where to locate [J.W. and A.W.] but did not want to "create trouble." Despite a familial relationship, [mother's] cousins had no legal right to contact with [A.W.]. [Father and

---

[3] The trial court bifurcated the trial, addressing consent separately from the "best interest" determination.

4.

mother], however, certainly did pursuant to the Lorain County Juvenile Court order. Neither, however, chose to enforce their legal right by filing any sort of pleading in that court. When [father] could communicate with [A.W.] through [mother] or certain members of [mother's] family with whom he had a good rapport, he did, at least occasionally. When this avenue was no longer available, however, he did not pursue a more direct route to his daughter. The Lorain County Juvenile Court parenting time order required [father] and [mother] to make arrangements for visitation with [J.W.], and not through other family members. If difficulties arose in making those arrangements, the proper remedy would have been a motion to modify visitation or a motion to show cause filed in the Lorain County Juvenile Court. These options were not pursued by either of [A.W.'s] parents.

While they may have been reluctant to respond, there is no evidence that either [J.W. or D.W.] engaged in any affirmative action to thwart [father's or mother's] attempts to communicate with [A.W.]. There is no evidence of interference. The Court therefore clearly and convincingly finds that the failure of [father and mother] to provide more than de minimis contact with [A.W.] during the one-year period immediately preceding the filing of the adoption petition was without justifiable cause.

Father filed a timely appeal of this decision.[4]

## III.    Assignment of Error and Analysis

{¶ 10} In his appeal, father argues the following as error:

**Father was justified in having minimal contact with A.W., as J.W. hid A.W. from Father and refused to communicate with multiple relatives when they attempted to find A.W. for Father.**

{¶ 11} R.C. 3107.07(A) governs adoption without the consent of a parent, based on lack of contact with the child, and provides:

Consent to adoption is not required of any of the following:

(A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

---

[4] The trial court also determined that mother's consent was not necessary. Mother did not appeal.

{¶ 12} A petitioner seeking adoption without consent of the parent must demonstrate that consent is not necessary by clear and convincing evidence. *In re Adoption of T.U.,* 2020-Ohio-841, 152 N.E.2d 943, ¶ 15 (6th Dist.). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *see also In re Adoption of T.U.* at ¶ 15.

{¶ 13} Where the claim is lack of contact, the trial court must find that a petitioner has proven, by clear and convincing evidence, that there was no more than de minimis contact for at least a year prior to the petition, and we review the decision regarding this factual question for an abuse of discretion. (Citation omitted) *In re Adoption of B.V.K.M.,* 6th Dist. Lucas No. L-18-1137, 2019-Ohio-1173, ¶ 23. Should a petitioner demonstrate a lack of contact during the year prior to the adoption petition, the burden shifts to the parent to demonstrate a "facially justifiable" cause for the lack of contact. *In re Adoption of T.U.* at ¶ 15, citing *In re Adoption of B.G.,* 6th Dist. Erie Nos. E-10-024 and E-10-024, 2010-Ohio-5025, ¶ 15 (additional citation omitted.).

{¶ 14} The petitioner still bears the burden of proof, however, and must demonstrate *the lack* of a justifiable cause by clear and convincing evidence to satisfy the

7.

requirements of R.C. 3107.07(A). (Emphasis added) *In re Adoption of T.U.* at ¶ 15, citing *In re Adoption of B.G.* at ¶ 15. In reviewing a trial court's determination regarding justifiable cause, we apply a manifest weight of the evidence standard. *In re Adoption of M.B.,* 131 Ohio St.3d 186, 2012-Ohio-236, 963 N.E.2d 142, ¶ 3. "Thus, if there is any evidence of record by which the trial court could have reached a firm conviction that [father's] failure to contact his daughter for a year was not justified, the trial court's judgment must be affirmed." *In re K.D.,* 6th Dist. Lucas No. L-09-1302, 2010-Ohio-1592, ¶ 17, citing *In re Adoption of Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985).

{¶ 15} In reviewing the trial court's decision, we first address the factual question, whether J.W. and D.W. demonstrated that father failed to have more than de minimis contact with A.W. for a year prior to the petition. *In re Adoption of M.B.* at ¶ 23; R.C. 3107.07(A). In this case, the parties do not dispute this fact, and father acknowledged he had no contact with A.W. after mother stopped visitation.

{¶ 16} Because lack of contact is not in dispute, we next address whether J.W. and D.W. proved, by clear and convincing evidence, that father lacked a justifiable cause for his failure to have contact with A.W. *Id.* at ¶ 23. Father claims J.W. interfered with his ability to communicate with A.W. by cutting ties with all family who maintained contact with him, by failing to update him regarding her new address, and by "hiding" A.W so father could not discover her whereabouts until after the one-year period had passed.

8.

"[T]o preclude a finding of justifiable cause, the non-custodial parent must have had 'uninhibited access to the [child] if contact was desired.'" (Citation omitted) *Holcomb* at 367.

{¶ 17} J.W. and D.W. each testified that neither father nor mother contacted them in any way for more than a year prior to filing the petition for adoption. J.W. testified that she had the same phone number for the entire time A.W. was in her care, and while she did not provide notice of her temporary residence, J.W. notified the juvenile court of her new address in Greenwich. Mother also knew J.W.'s new address. J.W. also testified that she had no knowledge of father's contact with A.W. through mother, prior to mother ending contact in late 2018.

{¶ 18} At trial, father testified that he had contact with A.W. in 2018, through mother during her parenting time at her cousin's house. Father was aware of the juvenile court proceedings but did not participate in them. However, he understood the terms of the order to require notice of an address change by J.W. and he never received notice of J.W.'s new address. Father had J.W.'s phone number and attempted to call J.W. "a couple times" in 2018 after the results of the paternity test. Because he was calling collect from prison, he could not leave a message. Father testified, "Well, I stopped calling [J.W.'s] phone, but I still had her cousins and [mother] still trying to get in touch with her, and my mother."

9.

{¶ 19} In 2018, father's contact with A.W. ceased, which he believed was due to J.W. ending communication with Kristi O. and another cousin who kept him informed (Jessica L.). He testified that J.W. "stopped answering [her cousins'] calls, blocked them on Facebook. She just would have no communication with them." Father acknowledged mailing a letter to J.W.'s house in 2018, but received no response. He testified, however, that he tried to reach A.W. "plenty of times" or "at least every month" but stopped calling and relied on mother and the cousins or his mother to reach A.W. after 2018. When asked if he could demonstrate the frequency of his phone calls with prison phone logs, father indicated he never requested those records. Father also claimed that none of J.W.'s family knew her address or how to reach her, with no testimony that he actually asked for that information.

{¶ 20} Instead of locating J.W.'s address and attempting to send mail to A.W. at J.W.'s house, father testified that he sent "cards and pictures and stuff over to [the cousin's] house." He knew that the cousins no longer had contact with J.W., and believed the cousins still had the mail for A.W. Father remained in contact with mother while he was incarcerated, and mother sent him pictures of A.W. After father left prison, he and mother lived together for a time in Elyria.

{¶ 21} Mother's and J.W.'s cousin, Kristi O., testified that she supervised mother's visits with A.W. in 2018. During this time, mother lived with Kristi O., and father called to speak to mother "maybe every other month." On at least one occasion,

10.

A.W. was also there when father called, and mother let father speak to A.W. Father did send cards for A.W. during that time, but Kristi O. was unsure when the cards stopped, stating, "I don't know when the last card came, so I'm not, I don't know." When asked if she had any way to pass on cards to A.W., once mother was gone, Kristi O. testified, "No. I didn't want to cause any trouble with [J.W.]. So I just, at some point it was just, okay, there is nothing I can do. I just want to see [A.W.]."

{¶ 22} Kristi O. had no more contact with A.W. once mother left her home and J.W. stopped bringing A.W. for visitation, but she did have contact with father. Kristi O. testified that father "would just call and see how the family was doing and ask if I had seen [A.W.]." Kristi O. told him she had not seen A.W. Kristi O. testified that she contacted J.W. using Facebook Messenger, because she no longer had a phone number for J.W., and she was able to FaceTime with A.W. the summer after the visitations ended. Kristi O.'s communications with J.W. conveyed Kristi O.'s desire to see A.W., with nothing about father or father's desire to see A.W. Kristi O. testified that she knew where J.W. was living after she moved, and believed father had the new address based on his contact with mother.

{¶ 23} Another cousin, Jessica L., also testified that she facilitated contact between father and A.W. up until J.W. broke off contact with the family after 2018. Jessica L. briefly had A.W., right after father was arrested, up until A.W. was placed with J.W. at mother's request. Jessica L. testified that she never objected to J.W. having

11.

custody "because there was no doubt in my mind that we were going to be able to see that baby." Gradually, however, access to A.W. became more and more infrequent. Jessica L. testified that father "would reach out to us to check on [A.W.] and to reach out to [mother]" and she would try to make sure father knew when A.W. would be with them. She testified that father sent "numerous" cards or letters, and they shared them with A.W., but then the visits stopped and "it was just done."

{¶ 24} After 2018, Jessica L. testified that she would text J.W. about seeing A.W., and she initially received responses, turning down her requests with excuses, but eventually the responses stopped. Jessica L. continued to have contact with father, and he asked for news regarding A.W. Jessica L. did not testify that father asked her to help him make contact. Instead, she testified that father would not have asked her for J.W.'s address because he was in contact with mother and mother had the address.

{¶ 25} Jessica L. knew "approximately where J.W. stayed" but never went to the house, stating "I wasn't going to put [A.W.] in that position." She never told J.W. she had cards or letters for A.W. from father, and after no communication from J.W., she stopped trying to make contact, indicating, "I personally was very upset and I just stopped." She acknowledged that any impediment to seeing A.W. was more about mother's failure to take action to reinitiate visitations because "J.W." had "all control," and not about an inability to locate J.W.

{¶ 26} Finally, M.L., A.W.'s paternal grandmother, testified regarding her attempts to spend time with A.W. She indicated she sent text messages to J.W., conveying her love to A.W. on holidays and birthdays and other occasions. She testified that mother shared some pictures with her in the beginning, until mother ceased contact. She also testified that father sent cards for her to give to A.W., but she had moved several times and no longer had any of the cards and she never tried to send any cards to J.W. Although M.L. had a phone with text messages to J.W., confirmed to be sent to the correct phone number, there were no text messages informing J.W. of father's desire for contact with A.W., and no mention of father's cards for A.W.

{¶ 27} Based on this record, father argues that he demonstrated justifiable cause for his lack of contact with A.W., because J.W. hid A.W. and significantly interfered with his ability to have contact. Despite evidence demonstrating that J.W. had no knowledge of father's contact through mother and the cousins, father contends that J.W. cut ties with those who communicated with him and moved without sending notice of her new address to prevent him from contacting A.W. In support, father relies on authority that is easily distinguished from the present case.

{¶ 28} Father compares his circumstances to those of the father in *In re Adoption of C.N.A.,* 2018-Ohio-897, 108 N.E.3d 553 (3d Dist.). In that case, the Third District Court of Appeals considered whether consent was required despite lack of communication, based on mother's significant interference. Mother remarried and the

step-father petitioned to adopt without the consent of the father. Father objected, and at trial, testified he had placed over a hundred phone calls during the one-year period, and mother responded only five times during that period and eventually blocked father's number. *Id.* at ¶ 19. After mother learned that the paternal grandparents were facilitating Skype calls with the child, she restricted the grandparents to supervised visitation. *Id.* Mother continued to communicate with father through Facebook Messenger, but refused to permit father to communicate with the child. *Id.* at ¶ 21.

{¶ 29} Mother admitted she refused to permit father to Skype with the child or visit the child, and when father came to mother's home, she told him to "stay off [her] property." *Id* at ¶ 22. After father came to watch the child compete at a wrestling meet, mother did not take the child to his three remaining meets of the season. *Id.* Mother justified her interference by alleging father repeatedly threatened her, which the trial court found to be a disingenuous claim. *Id.* at ¶ 23. The trial court determined father's consent was required for adoption, and the Third District affirmed. *Id.* at ¶ 32-34.

{¶ 30} In this case, father stopped calling J.W. after a couple of attempts, and never made a direct attempt to contact A.W., relying, first, on the chance that A.W. would be with mother when he called, and, later, only asking *about* A.W. when he talked to the Kristi O. or Jessica L., with no request for their help in reaching A.W. directly. Furthermore, J.W. had no knowledge of father's contact through mother, during the

period mother had visitation, so could not have severed ties with these people with an intent to cut off father's access to A.W.

{¶ 31} Father also relies on *In re Adoption of Zachary V.,* 6th Dist. Wood No. WD-01-039, 2002 WL 27514 (Jan. 11, 2002), where we considered a case in which the step father sought to adopt his wife's child without consent of the father, alleging no communication for a year prior to the petition. Father opposed the petition, conceding he had no contact but arguing his ex-wife concealed the child's whereabouts and interfered with his access. *Id.* at *2. Mother moved without providing her new address and changed her phone number, obtaining an unlisted telephone. *Id.* Father sought information from his son's maternal grandmother, but was unsuccessful. *Id.* at *2. Mother moved again, and once more failed to provide a new address. *Id.* at *2. At trial, mother admitted she refused access to the child. *Id.* at *2. Based on the facts and mother's admission, the trial court found the petitioner failed to demonstrate a lack of a justifiable cause for father's failure to communicate, and we agreed. *Id.*

{¶ 32} The concealment in *Zachary V.* is not present in this case. J.W. never changed her phone number, and while she did move, her whereabouts were known. In *Zachary V.,* moreover, the address was purposefully withheld despite pleas for information, and the mother admitted she refused access to the child. Here, father demonstrated no attempt to obtain an address after his phone calls went unanswered and mother stopped seeing A.W. Furthermore, father was aware of the juvenile court

15.

proceedings, but made no attempt to exercise any right to see A.W. by filing the appropriate motion in that case.

{¶ 33} Finally, father cites to *In re Adoption of Holcomb,* 18 Ohio St.3d 361, 481 N.E.2d 613. In that case, the Ohio Supreme Court found significant interference by father, relative to step-mother's petition to adopt without consent. Both parents engaged in conduct that tended to cut off the other's ability to communicate with the children. After agreeing to permit father extended visitation for the summer, mother moved with the children to California, and refused to provide a new address or phone number. *Id.* at 362. Father hired a private investigator, located his children, and had them returned to Ohio. *Id.* Father then filed a motion seeking change of custody, which he had to serve by publication as mother had moved again without a forwarding address. *Id.*

{¶ 34} "During the next three years, [mother and father] engaged in a protracted game of avoidance or * * * 'hide-and-seek.'" *Id.* Mother testified that father thwarted her attempts to communicate with the children, and she withheld her address and phone number to avoid father's harassment. *Id.* Mother testified that she asked her own mother to help locate the children, and sent letters and gifts to her mother for delivery once the children were found. *Id.* at 363. After no success in locating the children, mother returned to Ohio and drove around neighborhoods where they supposedly lived, and attempted to follow father home from work. *Id.* Father admitted to never providing a new address or phone number to mother or her parents, but argued mother could have

16.

located him through his work and asked, and depicted mother "as a person loathe to either communicate with her children or disclose her whereabouts due to a pending suit against her for $5,000 relating to their custody problems." *Id.* Based on the facts, the Ohio Supreme Court found that mother's "inability to obtain the address without a substantial investigatory effort, when viewed in conjunction with petitioner's refusal to provide even a scintilla of this information, establishes that there was justifiable cause for [mother's] failure of communication." *Id.* at 369. Therefore, mother's consent was necessary for adoption by the step-mother. *Id.*

{¶ 35} As in *Zachary V,* the father in *Holcomb* admitted he never provided a change of address or new phone number to the mother or her family, and the mother in *Holcomb* needed to undertake "substantial investigatory effort" to locate her children. Father, in this case, demonstrated little to no effort to communicate with A.W. once mother was no longer in A.W.'s life, and there was no testimony to suggest father made any effort to locate A.W. himself. Instead, the cousins indicated father would have known A.W.'s address, because mother knew A.W.'s address.

{¶ 36} Father's authority involves contrary facts, and therefore provides no support for his contention that J.W. and D.W. hid A.W. and interfered with his ability to contact her. Unlike the facts in *C.N.A., Zachary V.,* and *Holcomb,* father had J.W.'s phone number and did not call within a year of the adoption petition. Furthermore, while J.W. moved twice, she updated her current address with the juvenile court and her

17.

whereabouts were known to her cousins and mother, who were all in contact with father. Unlike the circumstances in father's cited authority, J.W. did not hinder father's attempts to locate A.W. and took no steps to prevent others from finding her or contacting her. Instead, the record demonstrated that J.W. was unaware of father's prior contacts, and father never attempted contact with A.W., himself, but was satisfied with contact through mother during the period in which mother made an effort to see A.W.

{¶ 37} Contrary to father's argument, he sent letters directly to J.W. only twice, once in 2018 shortly after receiving the results of the paternity test, and again in February 2022, a month before the trial. While father testified that he did not know J.W.'s new address, his witnesses indicated that he would have known the current address because mother knew it, and father remained in contact with mother. There was also no testimony to suggest father tried to obtain the correct address or took any steps to communicate with his daughter.

{¶ 38} Father's witnesses, Kristi O., Jessica L., and M.L., testified that father reached out to ask for updates on A.W., but nobody testified that father wanted to communicate with A.W. or sought assistance to do so. Father's witnesses each provided testimony relative to their own attempts to have a relationship with A.W., rather than attempts to foster a relationship between father and A.W. Both Kristi O. and Jessica L. testified that they had no contact with J.W. after visitations ended in 2018, despite a desire to remain in A.W.'s life, and M.L. testified she sent text messages to J.W., with her

18.

own greetings for A.W., and did not pass on gifts, cards, or messages from father or ask about facilitating parenting time or contact for father. After mother ceased contact, and communication between J.W. and the cousins and M.L. tapered off, father arguably showed interest in A.W.'s well-being, but there is no evidence demonstrating father had any interest in communicating with or seeing A.W.

{¶ 39} Significantly, to the extent that father argues he sought contact with A.W., he actually only contacted third parties who no longer had access to A.W. His own attempts, as supported by the record, were limited to an unanswered collect call and letters sent outside the one-year period prior to the adoption petition. Despite the provision for contact through J.W. in the juvenile court order, and father's knowledge of those proceedings, father never sought to initiate visitation, either through direct contact with J.W. or by filing something with the court.

{¶ 40} Considering the record, the greater weight of the evidence supported the trial court's finding, clearly and convincingly, that father lacked justifiable cause for having no contact with A.W. *See, e.g., In re K.D.,* 6th Dist. Lucas No. L-09-1302, 2010-Ohio-1592, ¶ 22 (where "the only effort that appellant made to contact his child during this period was a Myspace message and an unsuccessful visit to the clerk's office at juvenile court" the record demonstrated a lack of justifiable cause for no contact with the child); *see also In re Adoption of Ford,* 166 Ohio App.3d 161, 2006-Ohio-1889, 849 N.E.2d 330, ¶ 8 (3d Dist.) (where interference has not been demonstrated, "failed

attempts to communicate are not communication"). Therefore, J.W. and D.W. met their burden of demonstrating no justifiable cause for father's lack of contact with A.W. for more than a year prior to the adoption petition. Accordingly, we find father's sole assignment of error not well-taken.

### IV.    Conclusion

{¶ 41} Based on the foregoing, we affirm the judgment of the Huron County Court of Common Pleas, Probate Division, entered April 20, 2022. Father is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J. _____

_____
Gene A. Zmuda, J. _____ JUDGE

_____
Myron C. Duhart, P.J. _____ JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.